IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

* * * * * * * * *

| | |
|---|---|
| TONY PICKERING, et al.,<br><br>    Plaintiffs,<br><br>vs.<br><br>USX CORPORATION,<br><br>    Defendant. | CONSOLIDATED CASES:<br><br>Civil No. 87-C-838J<br>Civil No. 88-C-763J<br>Civil No. 91-C-636J |
| LYNN A. BARNEY, et al.,<br><br>    Plaintiffs,<br><br>vs.<br><br>USX CORPORATION,<br><br>    Defendant. | **MEMORANDUM OPINION & ORDER**<br><br>**FILED**<br>CLERK, U.S. DISTRICT COURT<br>September 19, 2013 (2:05pm)<br>DISTRICT OF UTAH |
| RELDON C. KENNY, et al.,<br><br>    Plaintiffs,<br><br>vs.<br><br>USX CORPORATION,<br><br>    Defendant. | |

* * * * * * * * *

On September 6, 2013, the above-captioned action came before the court for a hearing on a series of motions filed *pro se* by two named plaintiffs, Ronald J. Chilton and David L. Glazier. Mr. Chilton and Mr. Glazier appeared on their own behalf; Richard D. Burbidge appeared on

behalf of the plaintiffs' counsel of record. The court heard argument by the movants and counsel, and having considered the same in light of the record in this case as well as other proceedings of which this court was apprised, the court now rules as follows:

"Plaintiffs' Motion for an Order Commanding Defendants to Pay and Plaintiffs' Motion for an Order Recognizing a Vitiated State Court Ruling" (CM/ECF No. 812), seeks an order "commanding that the Defendants shall pay to Plaintiffs the 1987 accrued vacation benefit monies as dictated in" this court's 236-page Memorandum Opinion and Order entered in the above-entitled action on May 5, 1995 (CM/ECF No. 782),[1] and "recognizing the vitiation of the state court's September 22, 2005 decisions" concerning this court's *Pickering* opinion and the "applicable Basic Labor Agreement" that resulted in the denial of adjudication in *Chilton v. Young*, Civil No. 030105887 (3d Dist. Ct.), a state civil action that had been commenced by the movants and others against their attorneys of record in this action.[2] The gist of movants' argument appears to be this: Judge Brian's September 22, 2005 summary judgment ruling concluded that Messrs. Chilton, Glazier and others were not entitled to an award of accrued vacation pay for 1988 because "any vacation that might have accrued in 1987, to those eligible was not payable in 1988 because such vacation pay was forfeited when they were all effectively

---

[1] This Memorandum Opinion and Order is also available at *Pickering v. USX Corp.*, 1995 WL 584372 (D. Utah 1995). The court's prior Memorandum Opinion and Order on the liability phase of the proceeding is found at *Pickering v. USX Corp.*, 809 F. Supp. 1501 (D. Utah 1992).

[2] To "vitiate" is to "impair; to cause to have no force or effect . . . To make void or voidable; to invalidate either completely or in part . . . ." *Black's Law Dictionary* 1708 (9th ed. 2009); *see also Merriam-Webster's Collegiate Dictionary* 1399 (11th ed. 2003) (to vitiate is "to make faulty or defective," to impair, or "to make ineffective").

discharged on August 31, 1987, which was prior to January 1, 1988";³ Judge Brian construed their right to vacation pay to be forfeited under the applicable collective bargaining agreement "if the employee 'quits, retires, dies or is discharged prior to January 1 of the vacation year,'"⁴ and in doing so, movants insist that he misconstrued the terms of that agreement and ignored the *res judicata* effect of this court's 1995 Memorandum Opinion and Order. The movants submit that if the collective bargaining agreement is correctly construed and proper preclusive effect is accorded this court's 1995 Memorandum Opinion and Order, they are each legally entitled to such 1988 vacation pay, and that their counsel of record in this case—those named as "Defendants" in the caption of their motion, in contrast to USX—should be ordered by this court to pay them.

**BACKGROUND**

The movants' request finds its roots in a page or two of history.

In 1992, this court held the movants' former employer, USX Corporation, liable for violations of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1001 *et seq.*, on three theories: (1) that USX's failure to recall laid off steelworkers at the Geneva Steel Works to active employment prior to July 31, 1986 was motivated by USX's specific intent to interfere with those plaintiffs' attainment of pension benefit rights in violation of §510 of ERISA; (2) that USX's decision to "idle" the Geneva Works at the end of an August 1986-

---

³(Memorandum Decision, dated September 22, 2005, in *Ronald J. Chilton, et al., vs. Allen K. Young, et al.*, Civil No. 030105887 (3d Dist. Ct.), at 11 (annexed as Exhibit "B" to Memorandum in Support of Plaintiffs' Motion for an Order Commanding Defendants to Pay and Plaintiffs' Motion for an Order Recognizing a Vitiated State Court Ruling, filed July 16, 2012 (CM/ECF No. 813) ("Chilton-Glazier Mem.")).)

⁴(*Id.* (quoting 1987 Basic Labor Agreement at § 12-A-3).)

February 1987 "work stoppage" rather than operating, closing or selling the plant was similarly motivated by USX's unlawful intent to interfere with its employees' attainment of pension benefit rights in violation of §510 of ERISA; and (3) that USX amended its employee pension plan by reducing significantly the rate of future accrual of pension benefits without the written notice required by section 204(h) of ERISA. *See Pickering v. USX Corp.*, 809 F. Supp. 1501, 1531-59, 1560-66 (D. Utah 1992). The court's finding that USX violated ERISA raised the question of the proper remedies to redress these violations for the benefit of 1,892 former USX employees. Beginning with the claims of twenty-four "bellwether" plaintiffs whose individual circumstances seemed typical of many other plaintiffs, trial of this second "remedies phase" of the litigation commenced on October 14, 1993, and continued through nineteen days of trial. The presentation of evidence continued for nineteen days, and the court then took the matter under advisement.

As the movants recount, this court issued its Memorandum Opinion and Order on the remedies phase on May 5, 1995, detailing the back pay, retirement benefit accruals and similar relief to which nearly all of the bellwether plaintiffs were entitled. The 1995 Memorandum Opinion and Order called upon counsel to assist in computing specific remedial amounts and preparing the final judgment to be entered in favor of those plaintiffs. Plaintiffs' counsel also filed a motion for an award of attorney's fees and costs, which USX and related entities opposed.

In the midst of those matters, the parties engaged in settlement negotiations, and in July of 1995, USX agreed to pay more than $47 million for the benefit of 1,674 remaining plaintiffs[5]

---

[5]As the court noted in its May 1995 opinion, over two hundred retiree plaintiffs had settled their claims against USX in May of 1994.

together with several million additional dollars in retirement benefit accruals. The negotiation of that settlement and the acceptance of the USX proposal by the plaintiffs was handled by the parties' counsel entirely outside of this court's processes.[6] The court played no part in the USX settlement itself. As the record reflects, on July 21, 1995, counsel presented to the court a joint stipulation to dismiss this case as to all but two of the remaining plaintiffs (CM/ECF No. 794). On July 25, 1995, the court held a status conference concerning the parties' settlement and stipulation for dismissal, and based upon the representations made by counsel in open court and on the record that the matter was settled as to 1,675 plaintiffs, this court signed and entered the order of dismissal (CM/ECF No. 796) that same day.[7]

At no time were the terms of the parties' settlement reviewed or evaluated by this court, and at no time was this court called upon to oversee or supervise the administration or distribution of that settlement. No final judgment was ever entered by this court memorializing the relief granted in the May 1995 Memorandum Opinion and Order or reflecting the computation of any amount of back pay or other relief awarded to any named plaintiff.

### *Chilton v. Young*: the State Court Litigation

From the papers submitted by Messrs. Chilton and Glazier, it appears that some degree of discord arose between some plaintiffs and their attorneys concerning the amount and distribution

---

[6] The written materials submitted by the movants include a transcript of a June 28, 1995 meeting of plaintiffs' counsel with an assembly of the plaintiffs at Mountain View High School in Orem, Utah, at which the terms of the proposed settlement were discussed.

[7] (*See* Minute Entry, dated July 25, 1995 (CM/ECF No. 797).) The two remaining plaintiffs, Tom Chamberlain and Janet McDermott, settled with USX by mid-August, and submitted similar stipulations for dismissal. Orders of dismissal (CM/ECF Nos. 806, 809) were entered by August 21, 1995, bringing this case to an end.

of the USX settlement that subsequently led to the filing of a civil lawsuit against plaintiffs' counsel in 2002, *Ronald J. Chilton, et al., vs. Allen K. Young, et al.*, Civil No. 030105887 (3d Dist. Ct.).[8] Litigation in the state court action continued for several years, and the matter was finally decided in the attorneys' favor. The state court plaintiffs appealed, and in 2009 the Utah Court of Appeals affirmed the district court's judgment. *See Chilton v. Young*, 2009 UT App 265, 220 P.3d 171. The Utah Court of Appeals later denied a rehearing, and in March of 2010, the Utah Supreme Court denied certiorari review. *Chilton v. Young*, 230 P.3d 127 (Utah, March 17, 2010) (Table).

### *Chilton v. Young:* the Federal Civil Action

In July of 2010, Messrs. Chilton and Glazier filed a federal civil action against the same attorneys and two state district judges, among others, alleging fraudulent misrepresentation, malpractice, and other claims arising from the administration and disbursement of the USX settlement and the subsequent state court lawsuit.[9] After some considerable procedural wrangling, an October 4, 2011 Report and Recommendation by U.S. Magistrate Judge Paul Warner concluded that the case should be dismissed for lack of either diversity or federal question jurisdiction, among other reasons.[10] After receiving a series of objections and motions by the plaintiffs, Judge Dee Benson entered an order adopting the Report and Recommendation

---

[8]Apparently a prior lawsuit was filed in state court in 2001, but was dismissed without prejudice because of the plaintiffs' failure to effect timely service of process upon the defendants.

[9](*Ronald J. Chilton & David L. Glaizer vs. Allen K. Young, et al.*, Civil No. 2:10-CV-699 DB (D. Utah, filed July 26, 2010).)

[10](Report and Recommendation, filed October 4, 2011 (CM/ECF No. 85).)

and dismissing the action.[11]  Messrs. Chilton and Glazier did not appeal that dismissal.[12]

**The Chilton-Glazier Motion**

In July of 2012, Messrs. Chilton and Glazier filed the instant motion (CM/ECF No. 812), with an accompanying memorandum in support (CM/ECF No. 813).  As exhibits they also submitted copies of various documents, including state appellate briefs, deposition transcripts, a transcript of a June 28, 1995 meeting and a report on the distribution of the equitable award portion of the USX settlement fund.  A series of procedural filings followed (requests to submit for decision, objections, motions to strike, etc.), and the court then calendared the motion for hearing on September 6th.

**ANALYSIS**

**The USX Settlement**

The most salient fact bearing upon the movant's request for entry of orders in this case is the fact that this case was settled by agreement of the parties in July of 1995.  Whatever payment Messrs. Chilton and Glazier—or any other of the 1,675 remaining plaintiffs—were entitled to receive as part of that settlement was governed by the terms of the parties' settlement agreement as those terms were negotiated and concluded between plaintiffs' counsel and counsel for USX. The movants aver that plaintiffs' counsel told the plaintiffs that the proposed USX settlement "included everything that had been awarded in" this court's May 5, 1995 Memorandum Opinion

---

[11](Order Adopting Report & Recommendation, filed October 28, 2011 (CM/ECF No. 90).)

[12]They did procure an amended judgment in that case correcting the Clerk's original judgment which recited that the case had been decided by a jury.  (*See* Amended Judgment, filed December 13, 2011 (CM/ECF No. 100), in *Ronald J. Chilton & David L. Glaizer vs. Allen K. Young, et al.*, Civil No. 2:10-CV-699 DB (D. Utah.)

and Order, "and a little bit more."[13] Plaintiffs' counsel had indicated that the USX settlement fund would largely be distributed by analogy to this court's rulings as to the twenty-three bellwether plaintiffs, with an amount reserved for further equitable adjustments in specific cases. In their state lawsuit, the movants alleged that the administration of the USX settlement departed from this approach in several respects.

**The 1987 Vacation Pay Issue**

Of key importance here is the movants' assertion in the state court action that many of the plaintiffs qualified for vacation pay that accrued in 1987 and would have been payable in 1988 under the USX collective bargaining agreement, but that such accrued vacation pay was not taken into account in calculating the USX settlement distribution. They insist that the state district court erred in ruling that any vacation pay that accrued in 1987 was forfeited by the plaintiffs pursuant to a provision of the collective bargaining agreement providing that an employee "forfeits the right to receive vacation benefits . . . if he quits, retires, dies, or is discharged prior to January 1 of the vacation year."[14] As explained above, Judge Brian concluded that "any vacation that might have accrued in 1987, to those eligible was not payable in 1988 because such vacation pay was forfeited when they were all effectively discharged on August 31, 1987, which was prior to January 1, 1988."[15] They contend that by equating the "termination" of the plaintiffs'

---

[13](Chilton-Glazier Mem. at 4; *see* Transcript of Meeting, dated June 28, 1995, at 14:22-15:8, 18:11-14 (Mr. Orlofsky).)

[14](1987 Basic Labor Agreement at § 12-A-3.)

[15](Memorandum Decision, dated September 22, 2005, in *Ronald J. Chilton, et al., vs. Allen K. Young, et al.*, Civil No. 030105887 (3d Dist. Ct.), at 11 (annexed as Exhibit "B" to the Chilton-Glazier Mem.).)

employment by USX as of August 31, 1987 as found by this court with being "discharged" within the meaning of the forfeiture provision,[16] Judge Brian misconstrued the terms of the collective bargaining agreement and failed to give credence to this court's May 5, 1995 Memorandum Opinion and Order.[17] The movants argue that "discharged" specifically refers to being terminated from employment for good cause, in contrast to the sale by USX of the Geneva Works after August 31, 1987, which effectively terminated the plaintiffs' employment by USX without regard to good cause.[18]

The Utah Court of Appeals affirmed Judge Brian's ruling on this issue, rejecting the movants' argument:

---

[16] Judge Brian explained that "[a]s found in *Pickering*, none of the plaintiff steelworkers were employed by USX as of January 1, 1988. Therefore, this Court concludes that none of them were entitled to vacation pay accrued in 1987, that was payable in 1988." (*Id.*)

[17] The state court's 2005 memorandum decision does reflect some misapprehension of this case and this court's 1995 Memorandum Opinion and Order. For example, it recites that "Judge Jenkins did not consider any of the bellwether claims that were . . . 'layoff' (recall) plaintiffs because they had been dismissed with prejudice"; in fact, the "layoff" (or "recall") plaintiffs were the first category of bellwether plaintiffs addressed in the 1995 Memorandum Opinion and Order. It also discusses the question "whether, in class action litigation, an attorney has a duty to include attorney's fees in settlement negotiations and a proposed settlement," apparently not realizing that this case was not a class action.
    The state court noted that this court ruled that equitable relief under ERISA "would include 'an award of back pay (wages, sick leave, vacation pay, incentive pay and other employee compensation) equal to the compensation [they] would have received during the periods of recall to employment at Geneva'"—which included the seven-month "idling" period in 1987—but Judge Brian made no effort to reconcile that ruling with its own conclusion that 1987 vacation pay was forfeited under the terms of the 1987 Basic Labor Agreement.

[18] As this court explained, the plaintiffs' ERISA remedies "'must be measured within the terms of the 1987 BLA, [and] Pension Agreement, as if [plaintiffs] had remained active employees who were terminated when Geneva was sold to BM & T,' (*id.*) that is, on August 31, 1987." (Memorandum Opinion and Order, filed May 5, 1995 (CM/ECF No. 782), at 78, 1995 WL 584372, at *41 (quoting *Pickering*, 809 F. Supp. at 552).)

As to the 2005 order, the applicable contract provided that an employee forfeited the right to receive vacation benefits for a given calendar year if the employee was discharged prior to January 1 of that year. It is undisputed that Chilton and Glazier were terminated on August 31, 1987. Thus, the 2005 order correctly concluded that Chilton and Glazier were ineligible to receive vacation pay during 1988.

*Chilton v. Young*, 2009 UT App. 265, ¶ 5, 220 P.3d at 172-73.

**This Court's Rulings and Vacation Pay**

In its 1995 Memorandum Opinion and Order, this court did find that the plaintiffs' employment by USX was terminated as of August 31, 1987, when the Geneva plant was sold. This court also delineated the equitable remedies to which many of the bellwether plaintiffs were entitled under ERISA, among them "an award of back pay (wages, sick leave, *vacation pay*, incentive pay or other employee compensation) equal to the compensation [they] would have received during the periods of recall to employment at Geneva," less "any amount of income earned by [them] through other employment during those same periods."[19] Of particular concern was back pay that accrued during the seven-month period from February through August of 1987 during which USX "idled" the Geneva plant in violation of ERISA.

This court was *not* squarely presented with the question whether plaintiffs' vacation pay that accrued during 1987 would be forfeited pursuant to § 12-A-3 of the 1987 Basic Labor Agreement—as Judge Brian subsequently concluded—and thus the 1995 Memorandum Opinion and Order does not explicitly address that question.[20] Messrs. Chilton and Glazier implore this

---

[19](*Id.* at 108 ¶ 21, 1995 WL 584372, at 56 ¶ 21.)

[20]This court did expressly adopt the analysis of plaintiffs' expert, Dr. Paul Randle, concerning the calculation of back pay awards, noting that Dr. Randle treated vacation pay as "mitigating income" to be offset against the plaintiffs' lost wages amount, at least for 1986-87.

(continued...)

- 10 -

court to address it now and rule in their favor, notwithstanding the final judgment of the state courts to the contrary.

But the threshold question is whether this court has the power to do so.

**The State *Chilton v. Young* Judgment and the *Rooker-Feldman* Doctrine**

Generally, a collective bargaining agreement "is a federal contract and is therefore governed and enforceable by federal law, in the federal courts," *International Ass'n of Machinists v. Central Airlines, Inc.*, 372 U.S. 682, 692 (1963), and construction of the language of the 1987 Basic Labor Agreement as a collective bargaining agreement may thus raise a federal question over which this court has subject matter jurisdiction.[21]  Moreover, under § 301 of the Labor Management Relations Act, 29 U.S.C. § 185,[22] "'if the resolution of a state-law claim

---

[20](...continued)
(*Id.* at 80, 82, 1995 WL 584372, at *42, *43.)  Presumably, had the litigation proceeded to entry of judgment, the plaintiffs' back pay awards would have been computed in the fashion delineated by Dr. Randle.

[21]As one well-known treatise explains:

> Under the federal labor statutes, as interpreted by the United States Supreme Court, the rights of the parties to a collective bargaining agreement are governed by federal law. *This is true whether the action is brought in federal or state court.*  While resort to state law, if compatible with the purpose of the Labor Management Relations Act, is permissible to find the rule that will best effectuate federal policy, any state law applied in this manner will be absorbed as federal law.

20 Richard A. Lord, *Williston on Contracts* § 55:54, at 230-33 (4th ed. 2001) (emphasis added & footnotes omitted).

[22]Section 301(a) reads:

Suits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce as defined in this Act,
(continued...)

depends upon the meaning of a collective-bargaining agreement' the state-law claim is preempted." *Mock v. T.G. & Y. Stores Co.*, 971 F.2d 522, 529 (10th Cir. 1992) (quoting *Lingle v. Norge Division of Magic Chef, Inc.*, 486 U.S. 399, 405-06 (1988)); *see also Allis-Chalmers Corp. v. Lueck*, 471 U.S. 202, 208-10 (1985); *Johnson v. Beatrice Foods Co.*, 921 F.2d 1015, 1018-20 (10th Cir. 1990); *Marshall v. TRW, Inc., Reda Pump Division*, 900 F.2d 1517, 1520-22 (10th Cir. 1990); *United Assoc. of Journeymen and Apprentices, Local Number 57 v. Bechtel Power Corp.*, 834 F.2d 884, 887-89 (10th Cir. 1987) *cert. denied*, 486 U.S. 1055 (1988).[23] To the extent that it depends upon the construction of the 1987 Basic Labor Agreement, the movants' 1987 vacation pay claim may well have raised a federal question that could have been addressed by the federal district court in the first place.

Be that as it may, the matter proceeded through the state courts to its conclusion before the Utah Court of Appeals, with the Utah Supreme Court denying review—at which point the

---

[22](...continued)
or between any such labor organizations, may be brought in any district court of the United States having jurisdiction of the parties, without respect to the amount in controversy or without regard to the citizenship of the parties.

Section 301 "not only provides federal-court jurisdiction over controversies involving collective-bargaining agreements, but also 'authorizes federal courts to fashion a body of federal law for the enforcement of these collective bargaining agreements.'" *Lingle v. Norge Division of Magic Chef, Inc.*, 486 U.S. 399, 403 (1988) (quoting *Textile Workers v. Lincoln Mills*, 353 U.S. 448, 451 (1957)).

[23] As Williston explains, "the Supreme Court has held that state law does not exist as an independent source of private rights to enforce collective bargaining agreements, and federal law preempts state law claims that are based directly on rights created by the agreement, as well as claims substantially dependent on an analysis of the agreement." 20 *Williston on Contracts* § 55:58, at 255 (footnotes omitted).

state court judgment became final.[24]

The movants' current plea for this court's assistance with the vacation pay issue simply comes too late.

As our court of appeals reminds us, the *Rooker-Feldman* doctrine "bars federal courts from reviewing the judgments and decisions of state courts once they have become final." *D.A. Osguthorpe Family Partnership v. ASC Utah, Inc.*, 705 F.3d 1223, 1230 n.7 (10th Cir. 2013).[25] "The *Rooker-Feldman* doctrine establishes, as a matter of subject-matter jurisdiction, that only the United States Supreme Court has appellate authority to review a state-court decision." *Merrill Lynch Bus. Fin. Servs., Inc. v. Nudell*, 363 F.3d 1072, 1074–75 (10th Cir. 2004) (footnote omitted). "Thus, in applying the *Rooker-Feldman* doctrine, we focus on whether the lower federal court, if it adjudicated plaintiff's claims, would effectively act as an appellate court reviewing the state court disposition." *Id.* at 1075.

In *Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*, 544 U.S. 280 (2005), "the Supreme Court made clear that the *Rooker-Feldman* doctrine has a narrow scope," *Chapman v. Oklahoma*, 472 F.3d 747, 749 (10th Cir. 2006), and "applies only to suits filed after state proceedings are final." *Guttman v. Khalsa*, 446 F.3d 1027, 1032 (10th Cir. 2006).[26] Thus, the *Rooker-Feldman*

---

[24]Indeed, finality accords the state court judgment in *Chilton v. Young* preclusive *res judicata* effect on the vacation pay issue. *See Allen v. McCurry*, 449 U.S. 90, 94 (1980) ("Under res judicata, a final judgment on the merits of an action precludes the parties or their privies from relitigating issues that were or could have been raised in that action.").

[25]The *Rooker-Feldman* doctrine takes its name from the two Supreme Court cases in which its rule has been applied: *Rooker v. Fidelity Trust Co.*, 263 U.S. 413 (1923), and *District of Columbia Court of Appeals v. Feldman*, 460 U.S. 462 (1983).

[26]For purposes of the *Rooker-Feldman* doctrine, state proceedings are *final* "(1) 'when the
(continued...)

doctrine is triggered only "after the state proceedings have ended." 544 U.S. at 291; *D.A. Osguthorpe Family Partnership*, 705 F.3d at 1232.

But the present motion—requesting that this court enter an order that "the lower state court ruling is recognized as vitiated due to lack of jurisdiction to make a determination over matters pertaining to the *Pickering v. USX* case"[27]—falls neatly within the scope of the *Rooker-Feldman* doctrine because it was brought by "state-court losers complaining of injuries caused by state-court judgments rendered before the district court proceedings commenced and inviting district court review and rejection of those judgments." *Exxon Mobil*, 544 U.S. at 284. As a result, this court simply lacks the jurisdiction to do as the movants now ask.

**CONCLUSION**

Finally, we cannot lose sight of *what* it is that the movants actually sought to construe and enforce, first in the state court litigation, and now here. The movants do not seek direct enforcement of the rulings set forth in this court's 1995 Memorandum Opinion and Order—nor could they in a case in which eighteen years ago, the parties stipulated to dismissal with prejudice in lieu of entry of a final judgment on the merits. Nor do they seek to vindicate specific employee rights under the 1987 Basic Labor Agreement more than twenty-six years after the *Pickering* plaintiffs' employment was terminated by the sale of the Geneva plant. Instead the

---

[26](...continued)
highest state court in which review is available has affirmed the judgment below and nothing is left to be resolved'; (2) 'if the state action has reached a point where neither party seeks further action'; or (3) 'if the state court proceedings have finally resolved all the federal questions in the litigation, but state law or purely factual questions (whether great or small) remain to be litigated.'" *Guttman*, 446 F.3d at 1032 (quoting *Federación de Maestros de Puerto Rico v. Junta de Relaciones del Trabajo de Puerto Rico*, 410 F.3d 17, 24–25 (1st Cir. 2005)).

[27](Chilton-Glazier Mem. at 15.)

movants' arguments turn upon the construction and enforcement of the terms of the USX settlement agreement in this case.

The movants insist that the actual distribution of the USX settlement fund should have comported more strictly with the remedies delineated by this court as to the twenty-three bellwether plaintiffs, particularly as to the vacation pay component of the remedial back pay awards. Yet eighteen years later, the specific terms of the USX settlement and the particulars of the actual distribution of the settlement fund are still not before this court.

As explained to the assembled *Pickering* plaintiffs at the June 28, 1995 Mountain View High School meeting, plaintiffs' counsel anticipated a distribution of the USX settlement funds that would approximately equate with what the plaintiffs would have received had the remedies prescribed by this court's 1995 Memorandum Opinion and Order been implemented by analogy as to all 1,675 remaining plaintiffs. Counsel acknowledged at the June 28th meeting that the anticipated settlement distribution would be accomplished through standard awards calculated through averaging of employee categories rather than by detailed, individualized case-by-case computations.

Of necessity, such a formulation is somewhat imprecise and inescapably imperfect.

Individual circumstances were to be addressed by a hearing officer empowered to make case-by-case equitable adjustments to settlement distributions using a special fund set aside for that purpose.[28]

---

[28] The vacation pay issue was raised before the hearing officer, but not conclusively resolved. The hearing officer, former Third District Judge Scott Daniels, reported that "[o]ne issue has arisen repeatedly."

(continued...)

In a case as large and complex as this one, settlement bespeaks compromise, and compromise bespeaks approximate, but *imperfect* justice.

The actual distribution of the USX settlement fund may not have precisely mirrored this court's prescribed remedies as to the twenty-three bellwether plaintiffs, but it succeeded in putting significant amounts of money into the pockets of the prevailing bellwether plaintiffs—as well as the 1,652 remaining plaintiffs—without awaiting the years that would have been required to adjudicate that many individual claims in court, and free from the nagging uncertainty that always attends matters pending on appeal.

The movants' misgivings about that process were resolved against them in the state court proceeding that they pursued to finality in the state court of appeals, and at this point, given the jurisdictional consequences of the *Rooker-Feldman* doctrine, this court simply cannot alter that outcome.

For that reason,

**IT IS ORDERED** that "Plaintiffs' Motion for an Order Commanding Defendants to Pay

---

[28](...continued)
That issue is: vacation which would have accrued during the 1987 idling period. It is clear that had it not been for the unlawful idling everyone working at the steel mill would have accrued vacation. If any plaintiff is entitled to this award, every steel mill employee is also entitled, not just the 400 or so workers who applied for a special hearing. When Judge Jenkins calculated damages for the Bellweather [sic] plaintiffs, he offset 1986 vacation (paid in 1987) as a reduction to damages. Nevertheless, in calculating the standard award to each of the plaintiff groups, this vacation was not offset, nor did I offset it in calculating the additional awards from the equitable fund. Therefore, it would be inconsistent to add the vacation which would have accrued in 1987 and paid in 1988. In addition, it wouldn't be fair to compensate the workers who applied for a special hearing for their vacations without compensating all two thousand plaintiffs. Therefore I have not awarded any plaintiff additional money for 1987 vacations.

and Plaintiffs' Motion for an Order Recognizing a Vitiated State Court Ruling" (CM/ECF No. 812), is hereby STRICKEN, as are the subsidiary motions and requests filed in connection therewith (CM/ECF Nos. 818, 820, 814 & 822).

DATED this 19TH day of September, 2013.

BY THE COURT:

BRUCE S. JENKINS
United States Senior District Judge